## Harry A. Biossat, Appellee, v. Charles J. Trainor et al., on appeal of Charles J. Trainor, Appellant.

### Gen. No. 26,904.

1. SALES—*rights of purchaser from other than true owner.* It was a maxim of the common law and of the civil law that no man can transfer a better title than he himself has, and it is also a general rule that no man can be divested of his property without his own consent, and even an innocent purchaser under a defective title cannot hold the property against a true owner.

2. SALES—*estoppel of owner of property to deny seller's authority.* If the real owner of personal property has so acted as to clothe another with apparent authority to sell or pledge it, he will be precluded from denying, as against those who may have acted in good faith on that apparent authority and acquired the property for a consideration, that he has given such authority.

3. ESTOPPEL—*essentials of estoppel.* In order to give rise to an estoppel, it is essential that the party estopped shall have made a representation or statement, either expressed or implied, and that someone shall have acted on the faith of this representation, in such a way that he cannot withdraw from the transaction without damage.

4. SALES—*estoppel of owner of automobile to claim title as against innocent purchaser from ostensible agent.* Where an owner of an automobile places it in the possession of a man whose reputation for honesty and fair dealing is bad, and whom the owner considers a "crook," and such person is in the business of selling new and used automobiles, the car having been originally purchased from him, and the car is turned back for minor adjustments and repairs, and where after such repairs the owner of the car allows it to remain in the custody of the dealer for several weeks, with the knowledge that it is being exhibited to proposed purchasers, although the owner instructs the dealer that if he finds a purchaser to bring him to the owner, and ultimately the dealer effects a sale to an innocent purchaser who has no knowledge of the facts as to ownership, the owner will be estopped as against such purchaser from denying that the dealer had authority to sell, and if the owner brings an action against the innocent purchaser in trover, he cannot recover.

5. SALES—*determination of rights of innocent purchaser from one in possession.* In cases involving sales to innocent purchasers by persons to whom the possession of property involved has been given by the owner, the innocent purchaser may, or may not be, protected, and careful consideration must be given to all the facts of each case, the usages of trade being a circumstance of great importance.

Appeal from the Municipal Court of Chicago; the Hon. WELLS M. COOK, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1921. Reversed. Opinion filed May 17, 1922. Rehearing denied June 1, 1922. *Certiorari* denied by Supreme Court (making opinion final).

JAMES E. MCGRATH, for appellant.

HARRY A. BIOSSAT, *pro se.*

MR. JUSTICE THOMSON delivered the opinion of the court.

The plaintiff, Biossat, brought this action in re-

plevin in the municipal court of Chicago, thereby seeking to recover an automobile of which he claimed to be the owner. The action was subsequently changed to trover. Each of the defendants duly filed an affidavit of merits. There was a jury trial resulting in a verdict of guilty against the defendants and assessing the plaintiff's damages at $3,666.66. Motion for a new trial was overruled and judgment was entered on the verdict. The defendant, Trainor, appeals.

It appears from the evidence that Smith was in the automobile business and that his company was located on Michigan avenue in the City of Chicago, and had the local agency for certain cars; that in 1919 he sold the automobile here involved to the plaintiff, Biossat, and that about the first of the year 1920, this car was turned over to Smith by Biossat for the purpose of making some repairs.

It is the position of Biossat that there was no authority placed in Smith covering the selling of the car, but that he was merely to repair it; that he told Smith that any sale that was made, must be made by him, Biossat, and that if Smith found some one who was willing to buy it, he was to bring him to Biossat. On the other hand, it is the position of Smith that he had full authority to sell the car and that he showed it to various parties with that object in view, and, among others, Trainor; that he told Trainor that the car had been turned back by a purchaser to apply on the purchase of a new car. It is the position of Trainor that this was his understanding and that he bought the car on that basis from Smith for $4,000, paying a certain amount in cash, turning in an old Cadillac car, on the basis of $1,000, and canceling the bill he had against Smith for certain legal services.

On this appeal, the defendant, Trainor, urges several grounds in support of his contention that the judgment of the trial court should be reversed, but, in our view of the case, it will be necessary to consider

only one of them. It is urged that where the owner
of personal property allows another to appear as the
owner or as having full power of its disposition, an
innocent purchaser for value, without notice of the
actual facts, will be protected as against the claims of
the owner, who, under such circumstances, will be
estopped from denying that the one selling the prop-
erty had full title to it, or full power to sell it, by
reason of the negligence or mistaken confidence on the
part of the real owner, in allowing it to appear that
the ownership was in the party making the sale.

That no one can transfer to another a better title
than he, himself, has was a maxim alike of the common
law and of the civil law, as was pointed out by Chan-
cellor Kent and has been repeatedly held in numerous
decisions. We have a general rule in the law of per-
sonal property, to the effect that no man can be di-
vested of his property without his own consent and,
consequently, that even an innocent purchaser under
a defective title cannot hold the property against the
true owner. There are, however, some exceptions to
this rule, which are as well recognized and established
as is the rule itself. If the real owner of personal
property has so acted as to clothe another with ap-
parent authority to sell or pledge it, he will be pre-
cluded from denying, as against those who may have
acted in good faith, on that apparent authority, and
acquired the property for a consideration, that he had
given such authority, and the result as to them will be
the same as if he had really given it. This is an ap-
plication of the familiar doctrine of estoppel. In
order to give rise to an estoppel, it is essential that
the party estopped shall have made a representation
or statement, either expressed or implied, and that
some one shall have acted on the faith of this repre-
sentation in such a way that he cannot withdraw from
the transaction without damage. Williston on Sales,
secs. 310-312; 1 Mechem on Sales, secs. 154-155; *Levi*

*v. Booth,* 58 Md. 305; *Hopper v. Callahan,* 78 Md. 529; *Lemp Brewing Co. v. Mantz,* 120 Md. 176; *McNeil v. Tenth Nat. Bank,* 46 N. Y. 325; *Smith v. Clews,* 105 N. Y. 283; *Smith v. Clews,* 114 N. Y. 190.

By some authorities it is further announced as a general rule that in order to estop the real owner of personal property from asserting his title as against a person who has dealt with the one in possession, on the faith of his apparent ownership, something more than mere possession must be shown—that the owner must have clothed the one in possession with some indicia of ownership beyond mere possession. *Levi v. Booth, supra; Kiewel v. Tanner,* 105 Minn. 50. In our opinion, that broad proposition cannot properly be laid down as a general rule, but each case must necessarily be examined with respect to all its facts and attendant circumstances. There may well be situations where bare possession might be sufficient to bring a case within the exception to the general rule, that one may not be divested of his title to personal property without his consent, and other cases in which bare possession would not be sufficient, and it might be necessary, in order to enable an innocent purchaser to defeat successfully the claims of an owner, to require him to show that such owner clothed the seller with some indicia of ownership other than bare possession.

A careful examination of the authorities shows that there is not a little confusion in the application of these principles to various states of fact presented. In the leading English case of *Pickering v. Busk,* 15 East 38, there was an action of trover for a "quantity of hemp." It appeared that one Swallow, was a London broker engaged in the hemp trade. The plaintiff was a merchant at Hull. He purchased a quantity of hemp through the broker, Swallow, which hemp was lying at a wharf at Southwark. At the plaintiff's direction the hemp was transferred on the books of the wharfinger from the name of the seller to that of

Swallow. Other hemp was purchased by the broker for the plaintiff's account, which was transferred to the name of the plaintiff, "or Swallow." In this situation, Swallow, having certain contracts for the sale of hemp, in hand, and no hemp of his own with which to meet the contracts, satisfied them by the transfer of the plaintiff's hemp. The parties to whom Swallow transferred the hemp became bankrupt, and the plaintiff then brought an action in trover against their assignees, and it was held that the plaintiff could not recover. In that case Lord Ellenborough said: "If the principal send his commodity to a place, where it is the ordinary business of the person to whom it is confided, to sell, it must be intended that the commodity was sent thither for the purpose of sale. If the owner of a horse send it to a repository of sale, can it be implied that he sent it thither for any other purpose than that of sale? Or if one send goods to an auction room, can it be supposed that he sent them thither merely for safe custody? Where the commodity is sent in such a way and to such a place as to exhibit an apparent purpose of sale, that principal will be bound, and the purchaser safe."

In the case of *Levi v. Booth, supra,* the plaintiff, who was the owner of a valuable diamond ring, placed it in the hands of one DeWolff, who was a dealer in jewelry, and known to be such by the plaintiff. The latter had no shop or established place of business. The plaintiff placed the ring in his possession for the purpose of obtaining a match for it, or, failing in that, to get an offer for it. DeWolff had sold jewelry to the defendants on various occasions, and after securing possession of the plaintiff's ring, under the circumstances recited, he sold it to the defendants. In an action of trover, the plaintiff was permitted to recover, the court observing that "bare possession of goods by one, though he may happen to be a dealer in that class of goods, does not clothe him with power

to dispose of the goods as though he were owner, or as having authority as agent to sell or pledge the goods, to the preclusion of the right of the real owner. If he sells as owner, there must be some other indicia of property than mere possession. There must * * * be some act or contract on the part of the real owner whereby the party selling is clothed with the apparent ownership, or authority to sell, and which the real owner will not be heard to deny or question, to the prejudice of an innocent third party dealing on the faith of such appearance." The court pointed out that, if it were otherwise, people would not be secure in sending their watches to a jeweler to be repaired, or cloth to a clothing establishment to be made into garments. It was further observed by the court that if DeWolff, instead of being a mere dealer in jewelry, had occupied a shop where he carried on the business of jeweler, and the ring had been left with him to be mended or reset or exposed to inspection in order to procure an offer for it, without any authority to sell it, the owner could not be divested of his property if he did sell it. And, such being the case, the same rule would apply to one who did not conduct his business in a regular shop. In *Hopper v. Callahan, supra,* the court held that the bare possession of personal property ordinarily used in the operation of a farm was not sufficient to clothe a farm tenant with authority to dispose of it. The court said: "It is not the common business of persons who are placed in charge of farms to sell the personal property which the owners confide to their custody for the ordinary and necessary requirements of farms. Persons who purchased such property from them without the necessary evidence of their right to sell must take the consequences of their own improvidence." The court also observed that where goods were delivered to a person whose common business was the sale of such goods, it had been held that an authority to sell might be implied,

but that no such authority would be conferred by intrusting them to a person whose business was of a different nature.

In *Lemp Brewing Co. v. Mantz, supra,* the plaintiff placed certain wagons and harness in the possession of one Bissing, a customer, and Bissing used them in his retail business. In connection with that business, Bissing rented horses from the defendant, who allowed him to run up a considerable account on the strength of his apparent ownership of the wagons and harness. Bissing kept his equipment in the defendant's livery stable. He discontinued his business and left the wagons and harness in the defendant's possession. In a contest between the defendant and the Brewing Company, it was held that the latter was entitled to the property both on the ground that it had not clothed Bissing with the indicia of ownership and the further ground that the defendant was not in the position of a bona fide purchaser or pledgee.

In *McNeil v. Tenth Nat. Bank, supra,* the plaintiff owned some shares of stock in a bank the certificates of which he left with his stockbrokers to secure his account balance. He indorsed a blank assignment on the certificate with power of attorney to transfer the stock, which purported to have been executed for value. Without authority, the brokers pledged this certificate with other securities, and the pledgee was held to be entitled to hold the stock as against the plaintiff.

In that case the court said: "It must be conceded that, as a general rule, applicable to property other than negotiable securities, the vendor or pledgor can convey no greater right or title than he has. But this is a truism, predicable of a simple transfer from one party to another where no other element intervenes. It does not interfere with the well-established principle that, where the true owner holds out another, or allows him to appear as the owner of or as having full

power of disposition over the property, and innocent third parties are thus led into dealing with such apparent owner, they will be protected. Their rights in such cases do not depend upon the actual title or authority of the party with whom they dealt directly, but are derived from the act of the real owner, which precludes him from disputing, as against them, the existence of the title or power which, through negligence or a mistaken confidence, he caused or allowed to appear to be vested in the party making the conveyance.''

In *Smith v. Clews,* 105 N. Y. 283, the plaintiffs were diamond merchants. One Miers was a dealer in diamonds, his habit being to secure them from the larger dealers and sell them to his customers. The plaintiffs were advised that Miers had a customer for a pair of diamond earrings and they delivered a pair to him, taking his receipt therefor, reciting that he had received them, ''on approval, to show to my customers, said knobs to be returned to said A. H. Smith & Co. on demand.'' While they were in his possession, Miers sold them to the defendant, the latter purchasing them in good faith, supposing Miers to be the owner. The defendant had had previous similar dealings with Miers. In an action to recover possession of the ear knobs, it was held that the plaintiffs had conferred authority to sell, on Miers, and that the defendant had a good title as against them. The court observed that Miers was known to the plaintiffs to be a diamond dealer who was in the business of selling stones to whomever he chose. In this same case the court reached an opposite decision in 114 N. Y. 190, the issue in the record then being as to the admissibility of evidence tendered to show the meaning in the trade, of certain expressions found in the receipt given the plaintiffs by Miers at the time he obtained the articles in question. In the opinion of the court in the latter decision, it is observed that certain of the

facts involved, as recited in the former opinion, were not then properly before the court and could not be considered.

Beyond one or two basic principles, it is quite impossible, in our opinion, to formulate general rules which will be applicable in all cases involving such issues as are presented in the case at bar. Under some· circumstances where the owner has intrusted possession to one who is in the habit of selling such goods, but has given him authority only to exhibit the goods to possible purchasers and obtain offers from them, the innocent purchaser may not be protected. But, under other circumstances, an innocent purchaser may be protected. In these cases involving sales to innocent purchasers, by persons to whom possession of the property involved has been given by the owner, careful consideration must be given to all the facts involved in each individual case. The usages of the trade, in regard to sales of goods of the kind in question, is a circumstance of great importance, and there may be other circumstances of infinite variety, peculiar to the situation presented in the individual case.

On this feature of the case at bar there was a sharp conflict in the testimony, that conflict, in the main, being between the testimony of the plaintiff and of the defendant, Smith. While on an issue of fact we would be disinclined, on this record, to disturb the verdict of the jury and the judgment of the trial court, based on this conflicting testimony, we feel obliged to hold that, on the plaintiff's own testimony, and other facts shown by the evidence and not denied, as a matter of law, he is not entitled to recover in an action of trover as against the defendant Trainor.

It appears from the plaintiff's testimony that he bought the car in question from the Smith Motor Company in 1919, and that early in 1920, having had considerable trouble with the starting device on the car, he had Smith send one of his men out to his home and

get the car and take it to the place of business of the Smith Motor Company in order that the defect in the starting device might be remedied. Smith told him that he could fix it up so that it would be all right. After the car had been out of the plaintiff's possession for two or three weeks, he got a bill for repairs from one Rathman, and upon receiving this bill he called up Smith over the telephone and inquired about it and told Smith that he did not know Rathman and asked if the bill was correct. Smith told him that it was; that the Smith Motor Company did not do any repairing except making adjustments and minor repairs and that all other repair jobs were sent out to Rathman, whereupon the plaintiff sent a check to Rathman in payment of the bill. This was on February 10, 1920. At this time Smith told the plaintiff that some other repairs were needed on the car, involving the replacement of some engine part, and that this matter would take several weeks more. It appears from the testimony of the plaintiff that Smith mentioned the trouble the car had been giving and asked the plaintiff whether he would not help him get a loan in connection with his business if he (Smith) helped the plaintiff sell his car. The plaintiff testified that in connection with this suggestion from Smith, about selling his car, he reminded Smith that his reputation on the street was bad and that nobody would trust him, and that he did not propose to let Smith sell the car as his agent, but that if Smith wanted to make a sale of the car he would have to bring any prospective purchaser to the plaintiff personally. It seems that the plaintiff's wife had been ill and he was about to leave for the south. The plaintiff advised Smith of these facts, saying that if he could find any customers while he was away to "just hold them. * * * If you can find any before I go, all right." Smith asked the plaintiff if he would consider buying a new car, and the plaintiff said he would not buy any more cars from Smith because he

did not keep his promises. The plaintiff testified further that upon his return Smith told him that in his absence, one Zubisky, had been looking at the car and seemed pleased with it, and the plaintiff said: "All right, if you are going to make any deal with him, I want to see him." The Zubisky deal was not consummated and, a little later, Smith told the plaintiff he had "another fellow on the string." Upon plaintiff inquiring who it was, Smith told him the prospect was not very good, whereupon, the plaintiff said to Smith: "I don't want any of that kind of junk, I know you." According to the plaintiff's testimony, Smith finally admitted to him, about the middle of May, that he had sold the car, and when he found that out, the plaintiff testified that he told Smith, among other things, "I want that car back or I want the money." Neither being forthcoming, the plaintiff pressed Smith to find out to whom he had sold the car and Smith finally told him that it was the defendant Trainor. This information the plaintiff received about the middle or the last of May. On cross-examination, the plaintiff testified that he had been told that the service station of the Smith Motor Company was at the place of business of the company on Michigan avenue, in Chicago, and that he always took the car there when he wanted repairs made; that the place of business of the Smith Motor Company consisted of an office and showroom in front and a repair shop in the rear, which he presumed was Smith's, but that whether Smith owned the repair shop or not he did not know. He admitted that in the case of the repairs to the starting device, he knew that Smith had turned the car over to another to make the repairs and he had paid that other party for them. He further testified, on cross-examination, that he did not trust Smith and had told him so on several occasions, and further, that he knew it was a common practice in the automobile business to turn over an old car when purchasing a new one.

Biossat v. Trainor, 225 Ill. App. 271.

As to the nature of the business of the defendant Smith, which business was conducted as the Dan Smith Motor Company, a corporation, it appears from the uncontradicted evidence that the place of business was located at 2534 Michigan avenue, in the City of Chicago. This place of business consisted of a large salesroom or showroom, in the front part of the building. There was another room in the rear, connected with the front room by doors, and this rear room was occupied by a company known as the Westinghouse Company, as a shop. This latter company manufactured automobile springs and the shop was used for equipping cars with these springs. No part of this shop was used for the conduct of an automobile repair shop. There was an automobile repair shop at 2524 Michigan avenue, conducted by one Rathman, and any repair work that Smith had occasion to do was sent there. Smith testified that he had an arrangement whereby he kept his own car in the Westinghouse shop as a sort of convenience, apparently. He also testified that after Rathman finished the repair work on the plaintiff's car, he kept the car in the back room and offered it for sale. The plaintiff testified that when he was trying to get his car back from Smith, he went to the place of business of the latter a good many times but never was able to locate his car. Smith employed a service man to look after the work of overhauling and repairing. This man did not work in the Westinghouse shop. He testified that the plaintiff's car remained in the place of business of Smith all the time until it was sold to the defendant, Trainor, and that during that time the witness had it out on four or five occasions for the purpose of demonstrating it to prospective buyers, and that Smith had it out for the same purpose, three or four times, and that one of his salesmen also had it out for the same purpose on several occasions. This witness also testified that the Smith Motor Company did not con-

duct a repair shop at its place of business but that it sometimes made minor adjustments "on a carburetor or something like that." It further appears from the evidence that when the plaintiff and his lawyers first took this matter up with the defendant, Trainor, one of the questions discussed related to the possibility of plaintiff getting his money from Smith. Trainor testified that he saw the car at Smith's place of business several times.

The important elements present in the facts in this case are the following: Smith was in the business of selling automobiles, both new and secondhand. He did not conduct an automobile repair business. While the plaintiff may not have known of this situation previous to February 10, 1920, he did become aware of it then, and thereafter must be charged with knowledge of that fact. He knew that it was customary in the automobile business for a seller, such as Smith was, to take cars from purchasers in part payment for new cars and then sell these secondhand cars. He knew that Smith was exhibiting his car to prospective purchasers from time to time. He was absent from the city three or four different times, during the winter and spring of 1920, for periods of ten days or two weeks at a time, and on the occasion of his first trip he told Smith that if he found any customer while he was away, to hold him. He did not trust Smith and so told him on several occasions. He testified that Smith's reputation on the street was bad and that nobody would trust him; that he would not keep his promises. On one occasion he told Smith that he was a "crook."

In our opinion, where an owner of an automobile places his car in the possession of a man whose reputation for honesty and fair dealing is bad, and whom he considers a "crook," and this person is in the business of selling new and used automobiles, the car having originally been purchased from him, and being turned back to the dealer for some adjustments or

Biossat v. Trainor, 225 Ill. App. 271.

repairs, and, where, after such adjustments or repairs are made, the owner of the car allows it to remain in the custody of such dealer for weeks, with the knowledge that he is exhibiting it from time to time to prospective purchasers, and the owner instructs the dealer that in case he finds a purchaser he is to bring him to the owner, and ultimately the dealer concludes a sale to an innocent purchaser who does not know the owner nor any of the facts having to do with the ownership, or which would lead a reasonably prudent person to suspect such ownership, the owner will be estopped, as against such purchaser, to deny that the car was in the possession of the dealer with authority to sell, and where, on those facts, the owner brings an action of trover against the purchaser, he cannot recover. Especially is this true where the evidence shows, as it does in the case at bar, from the plaintiff's own testimony, that when he first heard of the sale in question, he demanded that his car be returned to him or that he be paid the money. In our opinion, this first blush reaction of the owner, upon learning of the sale, strongly indicates that, in fact, the dealer did have authority to make the sale. As between one who leaves his car with a man whom he considers a ''crook,'' knowing that the latter is looking for a purchaser, and an innocent purchaser, certainly the latter should be protected. We are unable to find any evidence whatever in the record indicating that the defendant Trainor had any knowledge, such as would put a reasonably prudent person on notice, that the car did not belong to Smith, or was not in his possession with full authority to sell it.

For these reasons, the judgment of the municipal court is reversed.

*Judgment reversed.*

O'CONNOR, P. J., and TAYLOR, J., concur.